IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LEXMARK INTERNATIONAL, INC.,

        Plaintiff,

v.

UNIVERSAL IMAGING INDUSTRIES, LLC,

        Defendant.

Case No. 8:18-cv-01047-WFJ-AEP

**DEFENDANT'S *RENEWED* MOTION AND MEMORANDUM
TO DISMISS THE AMENDED COMPLAINT[1]**

Defendant, Universal Imaging Industries, LLC ("UII"), moves this Court to dismiss Plaintiff's Amended Complaint pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure, and 35 U.S.C. §101, and in support thereof shows the Court as follows:

**I.    FACTUAL BACKGROUND**

This case involves printer toner cartridges and is one more battle in a long-running conflict between Original Equipment Manufacturers ('OEM"), such as Lexmark, and the aftermarket printer toner industry. The OEMs enjoy a significant markup on toner cartridges and have gone to great lengths to protect that market, from illegal "prebate" programs, to efforts to lock out the aftermarket with firmware traps, to dubious lawsuits, such as this.

---

[1] The issues raised herein were not addressed in the *Inter Partes* Reexamination requests and remain valid and viable bases for dismissal. *See*, *Neptune Generics, LLC v. Eli Lilly & Co.,* 921 F.3d 1372, 1378 (Fed. Cir. 2019).

UII is an aftermarket company operated by Steven Miller[2], who has been in the printer cartridge business for more than seventeen (17) years. Mr. Miller has obtained dozens of patents on various aspects of printer cartridges, many cross-licensed with Lexmark, with an emphasis on inventions that would permit a single cartridge to be used across many models of printers. Mr. Miller is a leader in the aftermarket industry and a strong advocate for fair competition among OEMs and aftermarket companies. As a result, this is not Mr. Miller's first time litigating against Lexmark, there have been several lawsuits going back many years. Most recently, one of Mr. Miller's companies, Advanced Cartridge Technologies, LLC, brought a patent infringement suit against Lexmark where a settlement was ultimately reached between the parties.[3]

To make matters more interesting, in 2016, Lexmark was acquired by a consortium led by Apex Technology of China,[4] ("Apex China") which is also in the aftermarket industry and UII's biggest direct competitor.[5] Apex China is the subject of an investigation by the United States for unfair trade practices. https://ustr.gov/sites/default/files/Section%20301%20FINAL.PDF. Apex China bought out another aftermarket competitor, Static Control. Apex China then approached UII and sought to buy UII out of the Lexmark aftermarket business. When that did not work, Apex China threatened to sue UII for patent infringement if UII offered the MX and MS

---

[2] Plaintiff brings the action against UII, with no cause of action against Mr. Miller individually. Yet, the Amended Complaint references "Miller" in the allegations instead of UII. This was presumably done to raise concerns among the aftermarket industry, UII's customers, and business relationships that Lexmark was pursuing Mr. Miller individually, another effort to chill the competition.
[3] Case No. 8:10-cv-486-T-23TGW.
[4] https://www.nytimes.com/2016/04/21/business/dealbook/lexmark-apex-pag-asia.html.
[5] According to the Recordings at the Patent Office, China Citic Bank Corp. holds a security interest in the Patents at issue.

chips at issue here. This threat came before UII even had prototypes of its MX and MS products and of course long before Apex China could have a good faith belief the unreleased products infringed.

Once UII released its Lexmark-compatible MX and MS chips, this lawsuit was brought, as promised. There remains serious questions whether Apex China/Lexmark has ever analyzed the UII chips, for the chips are highly secure to prevent hacking by competitors, including Apex China. There are no specific details in the Amended Complaint about how the chips function, which would be essential to have a good faith basis to assert infringement. There are merely pictures of components. Curiously, the Amended Complaint refers to Lexmark's return cartridge program (¶¶16-31), which was largely rejected by the United States Supreme Court in *Impression Products, Inc. v. Lexmark International, Inc.*, 581 U.S. ___; 137 S. Ct. 1523 (2017). The Amended Complaint boasts about a judgment Lexmark previously secured (based on an offer for judgment for $100 for each asserted count), which also have nothing to do with this case, but would make good marketing material for Apex China/Lexmark. Indeed, as soon as the case was filed, Apex China/Lexmark approached UII chip component manufacturers to convince them not to supply UII because of this lawsuit.

The Amended Complaint has twelve (12) counts, alleging a variety of different theories of infringement of different patents and newly-added declaratory judgment counts against UII patents. At least two of the asserted patents lay claim to well-known abstract ideas, seeking patent protection solely because the ideas are implemented by general purpose computer components, rendering them invalid. In addition, Lexmark fails to articulate facts supporting the knowledge requirements for all of the infringement

claims and employs improper shotgun pleadings to bundle all allegations in every count, rendering it impossible to sort out the claims and which allegations address which counts. The two patents claiming an abstract idea should be found invalid and the remaining counts of the suit should be dismissed.

## II. TWO PATENTS ASSERTED BY PLAINTIFF CLAIM PATENT-INELIGIBLE SUBJECT MATTER AND ARE INVALID UNDER THE *ALICE* STANDARD

Section 101 of the Patent Act identifies four categories of patent-eligible inventions: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. The Supreme Court has recognized three specific exceptions to patent-eligible subject matter: "laws of nature, physical phenomena, and abstract ideas." *Bilski v. Kappos*, 561 U.S. 593, 601 (2010). In *Bilski*, the Court considered whether method claims for protecting against risks in financial transactions were eligible for patent protection. *Id*. at 599. The *Bilski* Court recognized abstract ideas are ineligible for patent protection because a monopoly over such ideas would improperly preempt their use. *Id*. at 612-613.

Building on the decision in *Bilski*, the Supreme Court's decision in *Alice* determined that a patent claiming a method of mitigating "settlement risk" using a third-party intermediary was nothing more than an abstract idea implemented on a generic computer. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208; 134 S. Ct. 2347, 2352-53 (2014). The Supreme Court applied a two-part test to determine patent eligibility under Section 101. First, the Court must "determine whether the claims at issue are

4

directed to one of those patent-ineligible concepts" -- for example, an abstract idea. *Alice*, 134 S. Ct. at 2355 (citation omitted). When the claims are directed to an abstract idea, the Court must then evaluate the second prong of the *Alice* test, which asks "whether the additional [claim] elements [beyond the abstract idea] 'transform the nature of the claim' into a patent-eligible application." *Id.* at 2355 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289 (2012). The second step is described "as a search for an 'inventive concept' -- *i.e.*, an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Alice*, at 134 S. Ct. 2355 (quoting *Mayo*, 132 S. Ct. at 1294, 1296–98). This is because a "claim that recites an abstract idea must include 'additional features' to ensure 'that the [claim] is more than a drafting effort designed to monopolize the [abstract idea].'" *Alice*, at 134 S. Ct. at 2357 (quoting *Mayo*, 132 S. Ct. at 1294). The "concern that drives the exclusionary principle [i]s one of pre-emption." *Alice*, at 134 S. Ct. at 2354. Where a patent preempts the use of an abstract idea, it "impede[s] innovation more than it would tend to promote it, thereby thwarting the primary object of the patent laws." *Id.*

Analyzing the claims under *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014), reveal U.S. Patent Nos. 7,844,786[6] and 8,966,193[7] are directed to nothing more than the abstract idea of "debiting" available toner or ink. To do so, the claims employ standard computing components- memory to essentially count the number of pages printed. Patent-eligibility under Section 101 is a legal question. *In re Bilski*, 545

---

[6] Notably the '786 Patent issued long before the *Alice* decision.
[7] Although the '986 and '193 Patents are identified as being infringed in Counts II, IV, VI VIII, and X, these patents are incorporated by reference in each and every count of the Amended Complaint.

5

F.3d 943, 951 (Fed. Cir. 2008) (en banc), *aff'd*, 130 S. Ct. 3218 (2010). To survive such a motion to dismiss, the complaint "must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true raise a right to relief above the speculative level." *Cuvillier v. Sullivan*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Factual allegations are taken as true, but legal conclusions are not. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). An analysis under Section 101 is a threshold legal inquiry, which may be presented at the pleading stage. *In re Bilski* at 950. The Federal Circuit encourages consideration of Section 101 issues on a motion to dismiss under Rule 12(b)(6). *See Content Extraction & Transmission, LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1347–49 (Fed. Cir. 2014) (holding that abstract software claims can and should be determined unpatentable at the pleading stage under Rule 12(b)(6)); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 717 (Fed. Cir. 2014) (holding abstract method claim for distributing copyrighted media products over the Internet unpatentable at the pleading stage under Rule 12(b)(6)); *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, (Fed. Cir. 2017).

A. **COUNTING PAGES ON A GENERIC COMPUTER COMPONENT IS NOT PATENTABLE**

Claim 1 of both the '786 and '193 patents are the only specific claims Lexmark asserts as infringed in the Amended Complaint.[8] It is not necessary for the Court to construe terms of the particular claims in order to determine if the claims embody an abstract idea. *See Ultramercial*, 772 F.3d at 714-15 (concluding, "[w]ithout purporting to

---

[8] The '786 is a divisional Patent, which was part of what became U.S. Patent No. 7,426,613. This '613 Patent claims more technical aspects of the cartridge, leaving only the basic counter function as the focus of the '786 Patent.

6

construe the claims, as the district court did not," that the challenged claims were directed to an abstract idea implemented with "routine, conventional activity"); *Clear with Computers, LLC v. Altec Indus.,* No. 6:14-cv-00079, 2015 WL 993392, at *3; 2015 U.S. Dist. LEXIS 28816 (E.D. Tex. Mar. 3, 2015) ("The Court does not need to accept Volvo's characterization or assertion and can formulate a characterization of the claims without construing the claims.").

The abstract ideas making up the representative claims are readily apparent; both relate to "updating" standard computer memory as a mechanism to record usage of consumable components such as ink or toner. No reasonable construction of the claims would alter this fundamental premise. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc). *See also, Ultramercial*, 772 F.3d at 719 (finding "[n]o formal claim construction was required because the asserted claims disclosed no more than [an abstract idea] and there was no 'reasonable construction that would bring [them] within patentable subject matter'").

The claims are directed to the use of a generic computer device with non-volatile memory, as acknowledged in the specification of the '786 patent:

> …it will be appreciated that the present invention may be implemented in <u>any device having non-volatile memories</u>. This may include mobile phones, handheld computers, laptop computers, personal computers, servers, mainframe computers, personal digital assistants, and the like, and devices having minimal processing power and functionality, such as in devices with dedicated circuits for performing preprogrammed or uncomplicated tasks. <u>In brief, the present invention may be implemented in any computing device in which the usage of components may wish to be recorded using non-volatile memory.</u> Therefore, the embodiments herein describing non-volatile memories for tallying page counts and recording the depletion of ink in ink or toner cartridges are for illustrative purposes only and are not intended to be limiting examples.

('786 patent, 4:38-52, emphasis added; *see also* '193 patent, 4:51-65[9].) The specification continues, explaining that "[i]n imaging and printing devices, page counts recorded by non-volatile memory modules ("memory modules") may be incremented as pages are printed." ('786 patent, 4:53-44.) The memory may record the number of pages printed and the type (*e.g.* color or black and white), which track the remaining toner in the print cartridge. ('786 patent, 4:58-62.) The '786 patent explains that the data in memory is incrementally changed to track usage, by, for example, changing bits of data in memory until all 32 bits of data are changed to signify "full depletion of the toner cartridge." ('786 patent, 5:9-12.)

### B. THE CLAIMS ARE DRAWN TO AN ABSTRACT IDEA

Claim 1 of the '193 patent provides:

*1. A method of updating a memory module, comprising:*

*receiving, at a memory module, a command indicative of usage of toner or ink in a consumable item for an imaging device for instructing the memory module to punch out at least one bit of at least one specified bit field within the memory module indicative of the usage of toner or ink; and*

*processing the command at the memory module.*

This "invention" is simply the idea of recognizing that toner/ink was used and noting such usage. This is no different than the idea of maintaining accurate inventory of any consumable. Every day retailers track inventory by debiting stock items as they are purchased and for hundreds of years, retailers have recorded sold inventory on paper to maintain accurate records. Similarly, claim 1 of the '786 patent claims the idea of an inventory count, with both an incremental counter and memory, but it is not expressly

---

[9] The '193 patent incorporated portions of the specification from the '786 patent. For the most part, the cited portions from the '786 patent are also found in the '193 patent.

limited to toner or ink in the body of the claim (as was the case with claim 1 of the '193 patent):

*1. A method of updating memory modules, comprising:*

*receiving, at one or more memory modules, a command transmitted from a processing device, wherein the command comprises a) an increment counter command operable to instruct the one or more memory modules to increment a counter within the one or more memory modules and b) a punch out bit field command operable to instruct the one or more memory modules to punch out a specified bit field within the one or more memory modules; and*

*processing the command at the one or more memory modules.*

As shown above, both patents claim the idea of tracking "usage of components" using non-volatile memory, whether limited to toner or ink in the '193 patent and more broadly in claim 1 of the '786 patent. Consider claim 1 of each patent and the corresponding action described in the specification:

| Claim 1 of the '786 Patent | Exemplary Action in Described Embodiment |
|---|---|
| *1. A method of updating memory modules, comprising:* | |
| *receiving, at one or more memory modules, a command transmitted from a processing device, wherein the command comprises a) an increment counter command operable to instruct the one or more memory modules to increment a counter within the one or more memory modules and b) a punch out bit field command operable to instruct the one or more memory modules to punch out a specified bit field within the one or more memory modules; and* | Receiving at one or more memory modules of "any computing device" ('786 Patent, 4:39), an command to increment a counter (e.g. a page counter) ('786 Patent, 5:20-23) and "punch" out the data (*i.e.* changing the data in memory) ('786 Patent, 5:2-7) |

| Claim 1 of the '786 Patent | Exemplary Action in Described Embodiment |
|---|---|
| *processing the command at the one or more memory modules.* | Changing the memory to reflect the change in count (such as page usage) ('786 Patent, 12:44-48.) |

| Claim 1 of the '193 Patent | Exemplary Action in Described Embodiment |
|---|---|
| *1. A method of updating a memory module, comprising:* | |
| *receiving, at a memory module, a command indicative of usage of toner or ink in a consumable item for an imaging device for instructing the memory module to punch out at least one bit of at least one specified bit field within the memory module indicative of the usage of toner or ink; and* | Receiving at a memory module of "any computing device" ('193 Patent, 4:52) a command indicating toner or ink use to "punch" out the data (*i.e.* changing the data in memory) to reflect toner/ink usage ('193 Patent, 5:15-20) |
| *processing the command at the memory module.* | Changing the memory to reflect usage of toner/ink ('193 Patent, 15:12-16.) |

The specification makes clear that counting pages, toner usage, etc., is done simply by using generic hardware running in a conventional manner. As set forth in the background, "[n]on-volatile memory modules are commonly found in computing devices for recording the usage of components, including consumable components having a limited life span." ('786 Patent, 1:18-20.) The inventors acknowledge "non-volatile memory modules are <u>common</u> in imaging and printing devices [ ] for recording the use of consumables such as print cartridges [ ] based upon the number of pages printed by the device, or based upon the partial or full depletion of the print cartridges." ('786 Patent,

1:21-31, emphasis added.) The patents do not disclose a novel form or memory, but the use of conventional memory to count pages printed, far from a novel concept.

The Federal Circuit has explained that a relevant inquiry of step one is "to ask whether the claims are directed to an improvement to computer functionality versus being directed to an abstract idea." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016). In the '786 and '193 Patents, the specification is clear that the computer hardware used to track usage of consumables such as toner/ink are "non-volatile memory modules, in computing devices such as imaging and printing devices." ('786 Patent, 2:9-10.) There is no specialized hardware or software recited for enabling the tracking of toner/ink usage or page counts in claim 1 of each of the '786 and '193 Patents. To the contrary, the specification is abundantly clear that only conventional hardware is required. This shows that the claim is drawn to an abstract idea of counting printer usage and not to an improved computer system. *See Clear with Computers, LLC v. Altec Indus., Inc.*, No. 6:14-cv-00079, 2015 WL 993392, at *4, 2015 U.S. Dist. LEXIS 28816 (E.D. Tex. Mar. 3, 2015) (finding claim directed to an abstract idea where computer components were "functional in nature" and merely replaced a human salesperson). In actuality, the claims relate solely to standard inventory tracking, in this case, for purposes of monitoring usage of imaging devices.

Numerous courts have found claims similar to these invalid based solely on the pleadings. *See*, *Two-Way Media Ltd v. Comcast Cable Communs., LLC*, 874 F.3d 1329, 1333 (Fed. Cir. 2017) (Patents "generally relate[d] to a system for streaming audio/visual data over a communications system like the internet."); *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1318 (Fed. Cir. 2016) (claims "directed to a

conventional business practice—the screening of messages by corporate organizations—in the context of electronic communications" were "directed to an abstract idea"); *Affinity Labs of Tex. v. DIRECTV*, 838 F.3d 1253, 1258-59 (Fed. Cir. 2016) (finding claims to be nothing more than an abstract idea on a motion to dismiss because they claimed "the function of wirelessly communicating regional broadcast content to an out-of-region recipient, not a particular way of performing that function"); *see also*, *Telebuyer, LLC v. Amazon.com, Inc.*, Civil Action No. 2:13-cv-1677-BJR, 2015 U.S. Dist. LEXIS 96391, at *16-17 (W.D. Wash. July 23, 2015) (finding claims invalid under Section 101 because they merely implemented generic computer components to connect buyers and sellers online); *Tuxis Techs., LLC v. Amazon.com, Inc.*, Civil Action No. 13-1771-RGA, 2015 U.S. Dist. LEXIS 37128, at *6 (D. Del. Mar. 25, 2015) (on a motion to dismiss, finding claims to "ways to implement upselling in connection with [ ] remote electronic commerce" an abstract idea that amounted to nothing more than allowing step to be performed remotely or via the Internet).

Tracking page counts and toner/ink usage, like other typical inventory tracking methods, are not rendered patentable simply by using computer memory. *See OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015) ("relying on a computer to perform routine tasks more quickly or more accurately is insufficient to render a claim patent eligible"); *Bascom Research, LLC v. LinkedIn, Inc.*, 77 F. Supp. 3d 940, 948 (N.D. Cal. 2015) (finding claims to linking documents on a network to be patent ineligible under Section 101). "[T]he prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of [the idea] to a particular technological environment." *Alice*, 134 S. Ct. at 2358.

### C. THE CLAIMS LACK ANY INVENTIVE ELEMENT WHICH WOULD RENDER THEM PATENTABLE

Because the claims are directed to an abstract idea, they can only be patentable if the claim elements, either individually or viewed as an ordered combination, supply an inventive concept sufficient to transform the embodied abstract idea into a patent-eligible invention. *Alice*, 134 S. Ct. at 2355. Mere recitation of concrete, tangible components is insufficient to confer patent eligibility to an otherwise abstract idea; the components must involve more than performance of "'well-understood, routine, conventional activit[ies]' previously known to the industry." *Id.* at 2359 (quoting *Mayo*, 132 S. Ct. at 1294). The '786 and '193 Patents are unequivocal in the use of known and/or conventional memory. Critically, a valid claim must include "additional features" beyond the abstract idea itself, which "requires more than simply stating the abstract idea while adding the words 'apply it.'" *Alice*, at 134 S. Ct. at 2357. "To save a patent at step two, an inventive concept must be evident in the claims." *Two-Way Media Ltd. V. Comcast Cable Communs. LLC*, 874 F.3d 1329, 1338, *citing RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017).

As discussed in further detail above, the specification of both the '786 and '193 Patents admit (and rely on) the fact that tangible components of the claim perform well-understood, routine, and conventional activities, namely the use of non-volatile memory to track printing and toner/ink usage. Similar to the claims at issue, in *Ultramercial,* the claims fail the second step in *Alice*, as they were "not tied to any particular novel machine or apparatus, only a general purpose computer."

13

*Ultramercial*, 772 F.3d at 716. "[A]dding a computer to otherwise conventional steps does not make an invention patent-eligible." *Id*. at 717 (citing *Alice*, 134 S. Ct. at 2357). *See also*, *Voxathon LLC v. Alpine Elecs. of Am., Inc.*, No. 15-cv-00562-JRG, 2016 WL 260350, at *4, 2016 U.S. Dist. LEXIS 6800 (E.D. Tex. Jan. 21, 2016); *Papst Licensing GmbH & Co. KG v. Xilinx Inc.*, 193 F. Supp. 3d 1069, 1053 (N.D. Cal. June 9, 2016) (noting that the "steps of the asserted claims reflect activity described by the specification as previously having been carried out by humans" and finding the patent directed to a patent-ineligible abstract idea); *Walker Digital, LLC v. Google, Inc.*, 66 F. Supp. 3d 501, 507–09 (D. Del. 2014) (finding claim limitations did not add an inventive concept where the specification disclosed that "all of these steps could be performed (and have been performed) by human beings interacting with one another prior to the filing of the [asserted patent]"). Here, with nothing more than the use of computer memory, used in a conventional manner, there is no inventive concept that overcomes a finding of invalidity.

### III. <u>PLAINTIFF'S AMENDED COMPLAINT FAILS TO ALLEGE SUFFICIENT FACTS TO STATE A PLAUSIBLE CLAIM FOR INDIRECT OR WILLFUL INFRINGEMENT</u>

To sustain a claim for indirect infringement, a plaintiff must show, at a minimum, that the defendant had prior knowledge of the patent at issue. *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068 (2011). In *Global- Tech*, the Supreme Court reiterated that intent and prior knowledge is necessary for a claim for induced, contributory, or willful infringement. *Id.* at 2065-68. Specifically, the *Global-Tech* Court noted that to sustain a claim for induced infringement, the plaintiff must show that the defendant "actively" induced infringement, and explained that "[t]he addition of the

adverb 'actively' suggests that the inducement must involve the taking of affirmative steps to bring about the desired result." *Id.* at 2065. The defendant must have been aware, at the time it engaged in the conduct at issue, that its conduct constituted patent infringement of the asserted patents. *Id.* Knowledge of the infringement must occur before any indirect or willful infringement claim may arise.

Plaintiff fails to allege this essential element of the claims. Although Plaintiff attempts to allege indirect infringement of all ten patents, it only alleges (on information and belief) that UII had knowledge of two of the asserted patents. (Amended Complaint, ¶¶112, 125, 133, 141, 149, 157, 165, 173, 181, 189.) While Plaintiff makes conclusory allegations UII had knowledge of *two* patents, no factual information is provided as to those two and no allegation whatsoever is provided as to the other eight patents. (*See id*.) Even taking the allegation as true, there is no cause of action for indirect infringement or willful infringement with respect to eight of the ten patents. This deficiency infects at least Counts 3-10, all of which require knowledge. Plaintiff's allegations of indirect and willful infringement must therefore be dismissed.

IV. **PLAINTIFF'S AMENDED COMPLAINT FAILS BECAUSE IT IS AN IMPERMISSIBLE SHOTGUN PLEADING**

A complaint uses shotgun pleadings where "[e]ach count incorporates by reference the allegations made in a section entitled 'General Factual Allegations' — which comprise[d] 146 numbered paragraphs — while also incorporating the allegations of any count or counts that precede[d] it." *Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001). The Eleventh Circuit Court has "condemned" shotgun pleadings as

improper under Rules 8 and 10. *See Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313, 1324 (11th Cir. 2015).

Here, Plaintiff has attempted to plead twelve (12) counts and incorporates all of the initial 103 paragraphs into each count. (*See* Amended Complaint, ¶¶104, 117, 130, 138, 146, 154, 162, 170, 178, 186, 194, and 198.) The counts attempt to allege multiple theories of direct and indirect infringement, with varying elements and requirements, with the addition of two declaratory judgment counts directed to UII patents. It is impossible to determine, for example, the basis for knowledge or who the alleged direct infringer is (on claims of indirect infringement) with the pleadings rolled together. UII may have different defenses to each claim and Plaintiff has different burdens. Moreover, Plaintiff incorporates recitals about the UII '733 Patent into a claim of indirect infringement of Lexmark's '193 Patent. By the same token, details about UII devices are incorporated into claims Plaintiff's counsel abandoned the UII '733 Patent. Accordingly, to assist the Court, the parties, and the jury in maintaining each claim and related defense separately, the claims should be properly pleaded and allegations only incorporated where it is proper to do so.

## V.     **CONCLUSION**

UII respectfully requests that this Court dismiss the Plaintiff's Amended Complaint, and grant such other and further relief the Court deems just and appropriate.

Respectfully submitted May 29, 2020.

/s/ *Brian R. Gilchrist*
Brian R. Gilchrist, FL Bar #774065
bgilchrist@allendyer.com
Ryan T. Santurri, FL Bar #15698
rsanturri@allendyer.com
ALLEN, DYER, DOPPELT + GILCHRIST, PA
Post Office Box 3791
Orlando FL 32802-3791
Telephone: (407) 841-2330
Facsimile: (407) 841-2343

Woodrow H. Pollack, FL Bar #26802
wpollack@shutts.com
SHUTTS & BOWEN, LLP
4301 W. Boy Scout Blvd., Suite 300
Tampa, FL 33607
Telephone: (813) 463-4894
Facsimile: (813) 227-8234

**Attorneys for Defendant**

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 29, 2020, a true and correct copy of the foregoing document was served upon all counsel of record by electronic (email) delivery:

| | |
|---|---|
| David S. Johnson FBN 096423 | Timothy C. Meece (*Admitted Pro Hac Vice*) |
| Bonnie C. Daboll FBN: 730521 | Jason S. Shull (*Admitted Pro Hac Vice*) |
| Scott W. Anderson FBN: 738311 | Michael J. Harris (*Admitted Pro Hac Vice*) |
| JOHNSON DABOLL ANDERSON, PLLC | Audra Eidem Heinze |
| 2011 W. Cleveland Street, Suite F | (*Admitted Pro Hac Vice*) |
| Tampa, FL 33606 | Christopher J. Galfano |
| (813) 377-2499 (Telephone) | (*Admitted Pro Hac Vice*) |
| (813) 330-3156 (Facsimile) | BANNER & WITCOFF, LTD. |
| djohnson@jdalegal.com | 10 S. Wacker Drive, Ste. 3000 |
| bdaboll@jdalegal.com | Chicago, IL 60606 |
| sanderson@jdalegal.com | Tel: (312) 463-5000 |
| | Fax: (312) 463-5001 |

/s/ *Brian R. Gilchrist*
Brian R. Gilchrist, FL Bar #774065