**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

LEXMARK INTERNATIONAL, INC.,

Plaintiff,

v. Case No. 18-cv-1047-WFJ-AEP

UNIVERSAL IMAGING INDUSTRIES, LLC,

Defendant.
_______________________________________/

# CLAIM CONSTRUCTION OPINION AND ORDER

This cause comes before the Court on Lexmark International, Inc.'s Opening Claim Construction Brief (Dkt. 107); Universal Imaging Industries, LLC's ("UII") Opening Claim Construction Brief (Dkt. 108); and the parties' responsive claim construction briefs (Dkts. 113, 114). The Court held a hearing at which the parties presented their arguments. Having considered the parties' filings and arguments, the record, and applicable law, the Court issues the following order.

## I. BACKGROUND

This is a patent infringement case that involves authentication microchips used in toner cartridges. Plaintiff Lexmark manufactures laser jet printers. Lexmark's printers are designed to exclusively use Lexmark-brand toner cartridges. Each toner cartridge contains an authentication microchip that securely communicates with the printer to ensure the printer will only function using a

Lexmark-authorized cartridge. Dkt. 36 at 4–8. Lexmark has several patents for the technology used in the authentication chips. *Id.* at 8–10.

Defendant UII is a Florida-based technology company that develops and sells authentication chips for use in after-market toner cartridges compatible with Lexmark printers. *Id.* at 10. Lexmark filed this action for injunctive relief and damages, alleging that UII has introduced into the marketplace authentication chips that infringe on ten of Lexmark's patents.[1] *Id.* at 25–45. UII denies infringing any of these patents and counterclaims that Lexmark has infringed one of UII's patents, U.S. Patent No. 7,005,733.[2] Dkts. 67; 86.

As relevant here, the parties dispute the construction of claim terms in seven patents:

- Lexmark's '021, '657 Patents ("First Family of Address Change Patents");
- Lexmark's '079, '921 Patents ("Second Family of Address Change Patents");
- Lexmark's '786, '193 Patents ("Punch Out Bit Field Patents"); and
- UII's '733 Patent ("Anti-Tamper Patent").

[1] The patents are U.S. Patent Nos. 8,225,021; 8,386,657; 8,850,079; 9,176,921; 9,335,698; 7,844,786; 8,966,193; 9,245,591; 9,400,764; and 9,837,136.

[2] All patents will be referred to by the last three digits of their patent number.

## II. LEGAL STANDARDS

### A. Principles of Claim Construction

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004). Claim construction analysis thus "begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). And the construction of disputed claim terms is a task left exclusively to the federal courts. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996).

When construing a patent claim, a court must generally give the words of the claim their plain and ordinary meaning as understood by a person of ordinary skill in the relevant art. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). To determine this meaning, the court looks to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." *Innova/Pure Water*, 381 F.3d at 1116. In some cases, this meaning may be readily apparent even to lay judges, but often it is not. *Phillips*, 415 F.3d at 1314. When the meaning is not apparent, the court must construe a disputed term by taking something of an inside-out approach. The court will look first to intrinsic evidence—the words of the claims themselves, the

specification, and the prosecution history—and use extrinsic evidence—technical dictionaries, learned treatises, and expert and inventor testimony—only to supplement the intrinsic evidence or to provide a reference point for the state of the relevant art. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *Phillips*, 415 F.3d at 1314–19.

***1. Intrinsic Evidence.*** The claim language is the obvious starting point for construing a disputed term. The context in which the term is used within the asserted claim can be highly instructive. *Phillips*, 415 F.3d at 1314; *see, e.g.*, *Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1356 (Fed. Cir. 1999) (construing claim term "discharge rate" based on term's usage in a separate limitation in the same claim). The use of the disputed term in other claims within the same patent can be helpful because terms are generally understood to have a consistent meaning throughout the patent. *Phillips*, 415 F.3d at 1314. Differences between claim terms can also provide additional clarification. The doctrine of claim differentiation "create[s] a presumption that each claim in a patent has a different scope." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998). So, for instance, when a dependent claim adds a limitation to an independent claim, the independent claim is understood not to include the added limitation. *See Phillips*, 415 F.3d at 1314–15.

Claims must also be read in the context of the entire patent of which they are a part. *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998). The written specification "is always highly relevant to the claim construction analysis." *Vitronics*, 90 F.3d at 1582. It is like a "concordance of the claims" that serves to "describe the manner and process of making and using the patented invention." *Phillips*, 415 F.3d at 1315 (cleaned up). Because of this close relationship between the specification and the claims, the specification is often "the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582.

But while the claims must be read in the context of the specification, courts must not read limitations from the specification into the claims "absent a clear disclaimer of claim scope." *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1373 (Fed. Cir. 2007). This guidance applies in particular for specific embodiments of the invention provided in the written description. The purpose of the written description is to teach one skilled in the art how to make and use the invention—not to define its limitations—and an embodiment teaches by way of example. *See Phillips*, 415 F.3d at 1323; *see also Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1347 (Fed. Cir. 2010) ("Claims define and circumscribe, the written description discloses and teaches."). And even when a patent describes only a single embodiment, claims will not be "read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or

expressions of manifest exclusion or restriction.'" *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (quoting *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002)).

Along with the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Phillips*, 415 F.3d at 1317 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc)). The prosecution history consists of the full record of the proceedings before the Patent and Trademark Office (PTO) and may help clarify how the inventor understood the invention and whether the inventor limited the invention during prosecution in a way that narrowed the scope of the claims. *Id.* But because the prosecution history "represents ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1317.

***2. Extrinsic Evidence.*** Finally, the court may consult extrinsic evidence outside the patent and the prosecution history. Sources such as dictionaries, treatises, and expert testimony may help the court "better understand the underlying technology" and the field of the invention. *Phillips*, 415 F.3d at 1318; *Vitronics*, 90 F.3d at 1584 n.6. But this evidence is "less significant than the intrinsic record in determining the legally operative meaning of disputed claim

language." *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004) (cleaned up). And while extrinsic evidence may be useful to the court, "it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Phillips*, 415 F.3d at 1319.

**B. Departure from the Plain and Ordinary Meaning of the Claim Language**

There are only two exceptions to the rule that courts must construe claims according to their plain ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution." *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). The standard for applying either of these exceptions is "exacting." *Id.* at 1366.

For the patentee to act as its own lexicographer, it must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to redefine the term." *Id.* at 1365 (cleaned up). A patentee may also act as its own lexicographer by coining and defining a new term that does not exist in the relevant art "[s]o long as the meaning . . . is made reasonably clear and its use is consistent within a patent disclosure." *Lear Siegler, Inc. v. Aeroquip Corp.*, 733 F.2d 881, 889 (Fed. Cir. 1984). When a patentee coins terms that have no ordinary and customary meanings in the art, but does not directly define the terms, the court

will give the term components their plain and customary meanings to infer the meaning of the phrase. *See, e.g.*, *Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1372 (Fed. Cir. 2004).

Likewise, "[p]rosecution disclaimer or disavowal must be clear and unmistakable." *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014). This typically requires "expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Thorner*, 669 F.3d at 1366 (quoting *Teleflex*, 299 F.3d at 1325).

**C. 35 U.S.C § 112(f) Means-Plus-Function Claims[3]**

Section 112(f) allows for a claim limitation to be expressed in a means-plus-function format.[4] A means-plus-function limitation recites a function to be performed rather than definite structure or materials for performing that function. *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1307 (Fed. Cir. 1998). A claim's use of the word "means" raises a presumption that § 112(f) applies. *Williamson v. Citrix Online, LLC*, 792 F.3d

---

[3] With the passage of the America Invents Act of 2011, the nomenclature changed from "§ 112, ¶ 6" to "§ 112(f)."

[4] Section 112(f) provides in full that:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

1339, 1349 (Fed. Cir. 2015) (en banc). The failure to include the word "means" triggers a presumption in the opposite direction—that § 112(f) does not apply. *Id.* This second presumption is not a strong one. *Id.* It can be overcome and § 112(f) will apply if a party shows that the disputed claim term "fails to 'recite[ ] sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" *Id.* at 1348 (quoting *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000)).

Once it is established that § 112(f) applies, construction of a means-plus-function limitation is a two-step process. "First, the court must determine the claimed function. Second, the court must identify the corresponding structure in the written description of the patent that performs that function." *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1332 (Fed. Cir. 2006) (citations omitted). A "structure disclosed in the specification is [a] 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *B. Braun Med., Inc. v. Abbott Lab'ys*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). The corresponding structure "must include all structure that actually performs the recited function." *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1119 (Fed. Cir. 2002). But at the same time, § 112 does not allow "incorporation of structure from the written

description beyond that necessary to perform the claimed function." *Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999).

## III. AGREED-UPON CONSTRUCTIONS

The parties have agreed to the following constructions as set forth in the joint chart submitted prior to the evidentiary hearing. *See* Dkt. 104.

### A. Lexmark's U.S. Patent No. 7,844,786

| Claim Term | Agreed Construction |
|---|---|
| "processing the command at the one or more memory modules" | "executing instructions to perform the command described in this claim at the one or more memory modules" |

### B. Lexmark's U.S. Patent No. 8,386,657

| Claim Term | Agreed Construction |
|---|---|
| "changing the slave address" | "switching from one slave-device address to another" |

### C. Lexmark's U.S. Patent No. 8,966,193

| Claim Term | Agreed Construction |
|---|---|
| "processing the command at the memory module" | "executing instructions to perform the command described in this claim at the memory module" |

### D. Lexmark's U.S. Patent No. 9,245,591

| Claim Term | Agreed Construction |
|---|---|
| "limits a voltage on a first signal line of the plurality of signal lines to be no more than an intermediate voltage greater than voltage levels corresponding to a binary zero state | "limits a voltage on a first signal line of the plurality of signal lines to be no more than an intermediate voltage which is greater than a voltage level representing a logical '0' and is less than a voltage level representing a logical '1'" |

| | |
|---|---|
| and less than voltage levels corresponding to a binary one state” | |

**E. Lexmark’s U.S. Patent No. 9,335,698**

| Claim Term | Agreed Construction |
|---|---|
| “store a record of whether the toner cartridge is out of usable toner” | “maintain a useable record for future use, in the memory device, a record of whether the toner cartridge is out of sufficient toner to continue to refill a sump of the imaging unit” |
| “pages remaining for a page countdown for display by the imaging forming device” | “the number of remaining pages that can be printed by the image forming device before requiring replacement of the toner cartridge is stored in the memory device, for display by the imaging forming device” |
| “the toner cartridge is out of useable toner” | “toner can no longer be dispensed from the toner cartridge to refill a sump of the imaging unit” |
| “an amount of toner used by the image forming device after the image forming device declares the reservoir out of useable toner” | “an amount of toner used by the image forming device after the image forming device declares the toner cartridge reservoir can no longer dispense toner to refill a sump of the imaging unit” |

**F. Lexmark’s U.S. Patent No. 9,400,764**

| Claim Term | Agreed Construction |
|---|---|
| “busy condition” | “the memory module is busy processing a previous command” |
| “voltage on a first signal line of the plurality of signal lines to be no more than an intermediate voltage greater than voltage levels corresponding to a binary zero state and less than voltage levels corresponding to a binary one state” | “a voltage on a first signal line of the plurality of signal lines is limited to be no more than an intermediate voltage which is greater than a voltage level representing a logical ‘0’ and is less than a voltage level representing a logical ‘1’” |

Having reviewed the intrinsic and extrinsic evidence, the Court adopts the parties' agreed-upon constructions.

## IV. CONSTRUCTION OF DISPUTED TERMS

### A. Lexmark's U.S. Patent Nos. 8,225,021 and 8,386,657 ("First Family of Address Change Patents")

The '021 and '657 Patents are both entitled "Dynamic Address Change for Slave Devices on Shared Bus." The '657 Patent is a continuation of the '021 Patent, and the patents have nearly identical written descriptions. In general, these patents are directed at providing a means for authenticating printer supplies, such as ink or toner cartridges, by changing the addresses of microchips associated with those supplies. *See* '021 Patent, 1:42–2:15, 3:8–25.[5]

The authentication process uses a master/slave communication system on a shared bus. *Id.*, 1:7–8. A well-known method for providing data communication between a master and slave devices is the Inter-Integrated Circuit ($I^2C$) technique. In this setup, the master device initiates communications with a specific slave device by transmitting the slave device's unique address along with a command on the bus, i.e. the wire connecting the master and slave devices. The matching slave device receives the command and sends an acknowledgment back to the master device, and a two-way communication path is established. *Id.*, 1:25–41.

[5] The First Family of Address Change Patents have the same written description, so for convenience all citations will be to the '021 Patent.

While effective, this setup can be easily compromised. An imposter device can be connected to the communication bus, detect the unique slave address, and begin using the address. Relevant here, an unauthorized toner cartridge could be installed in a printer and function as though it were an authorized item. *Id.*, 1:42–2:15.

The First Family of Address Change Patents confronts this issue by eliminating the need for open two-way communication between the master and slave devices. The patents use a coded communication system known only to the master and slave. The master and slave run an address change algorithm. The master sends a change address command to the slave device. The slave device changes its address according to the algorithm but does not communicate the new address back to the master. The master, running the address change algorithm, accurately predicts the new address, allowing the master and slave device to communicate. This process repeats whenever the master sends a change address command. *Id.*, 2:19-3:24.

Claim 1, an exemplary claim from the ’021 Patent, describes the claimed address change system. The claim is reproduced below with the disputed terms in bold:

> **1.** In a data communication system of the type in which a master device communicates over a shared data bus with one or more slave devices,

where each slave device is identified by a unique address, the slave device comprising:

an **address generator** associated with said slave device, said **address generator generating plural addresses** so that the address of said slave device can be changed; and

said slave device is responsive to a command from the master device for changing the respective address thereof, and said slave device that processes said command controls its **address generator for changing the address thereof**, wherein said slave address includes a variable address bit portion and a fixed address bit portion.

| **Construction of "Address Generator"** | | | |
|---|---|---|---|
| **Disputed Claim Term**[6] | **Lexmark's Construction**[7] | **UII's Construction** | **Court's Construction** |
| "address generator" | "software or electronic circuitry implementing an algorithm to ***provide*** address values by performing the specified algorithm" | "software or electronic circuitry implementing an algorithm to ***create*** address values by performing the specified algorithm" | "software or electronic circuitry implementing an algorithm to ***generate*** address values by performing the specified algorithm" |
| "address generator generating plural addresses" | "software or electronic circuitry capable of implementing an algorithm to ***provide*** more than one address values by performing the specified algorithm" | "software or electronic circuitry capable of implementing an algorithm to ***create*** more than one address values by performing the specified algorithm" | "software or electronic circuitry capable of implementing an algorithm to ***generate*** more than one address value by performing the specified algorithm" |

[6] The disputed terms appear in Claims 1, 12, 16, and 21 of the'021 Patent and Claims 1, 10, and 15 of the '657 Patent.

[7] Lexmark has agreed to adopt UII's constructions except with "provide" in place of "create." Dkt. 113 at 1–2.

| | | | |
|---|---|---|---|
| "address generator for changing the address thereof" | "software or electronic circuitry capable of implementing an algorithm to ***provide*** an address value by performing the specified algorithm" | "software or electronic circuitry capable of implementing an algorithm to ***create*** an address value by performing the specified algorithm" | "software or electronic circuitry capable of implementing an algorithm to ***generate*** an address value by performing the specified algorithm" |

**Dispute:** The parties' core dispute is over the meaning of "address generator." Lexmark has agreed to accept UII's proposed construction if the word "create" is replaced with "provide." The word "create" does not appear in the extrinsic evidence, as Lexmark points out, and the specification states that the address generator need only provide an address, not create address values.

UII counters that "create" is the proper term based on the need to distinguish the invention from the relevant prior art. According to UII, the master-slave address generator process is well-known in the microchip field. To distinguish the invention during prosecution, the patentee limited the broadest claim by requiring the slave address to include both a fixed- and variable-bit portion—with the variable-bit portion to be created or brought into existence by a pseudorandom address generator.

**Analysis:** The Court finds the parties' proposed definition will suffice—but using the word "generate" in place of either "provide" or "create." An address

generator by definition generates addresses. The claim language (quoted above) tracks this understanding, stating the slave device is comprised of: "an address generator associated with said slave device, said address generator *generating* plural addresses . . . ." When referring to the address generator, the specification repeatedly describes it as something that "generates" or is "generating" addresses. *See* '021 Patent, 2:50–51, 2:65–67, 3:20–22, 5:50–64. While Lexmark is correct that the specification uses "provide" in several instances, *see* '021 Patent, 2:34–35, 6:7–8, 7:22–26, 8:3–4, "generate" is more faithful to the claim language and thus the proper term.

UII's suggestion to use "create," however, is not supported by the claim language or the intrinsic evidence. The term appears nowhere in the patent or the prosecution history. UII's expert witness, Dr. Direen, advocated using "create" because he wanted to find a synonym that would help someone better understand "address generator" without using generator, or its root word, in the definition. Dkt. 113-2 at 134. But eventually Dr. Direen conceded that because "create" did not appear in the patents, it might be better to use "generate." Dkt. 113-2 at 156–57. In its briefing, UII also uses "generate" interchangeably with "create." Dkt. 108 at 21; Dkt. 114 at 9. Accordingly, the Court adopts the parties' agreed to definition but with the word "generate" in place of the suggested alternatives.

**B. Lexmark's U.S. Patent Nos. 8,850,079 and 9,176,921 ("Second Family of Address Change Patents")**

The '079 and '921 Patents are both entitled "Dynamic Address Change Optimization." The '921 Patent is a continuation of the '079 Patent. Like the First Family of Address Change Patents, the Second Family pertains to the security of communications between a master device and component device using an address change code. The main difference between the two Families is that the Second Family of patents provides for a protocol in which the master device delivers a series of address change requests to the component, rather than a single change request. '921 Patent, 2:54–65, 6:45–49, 8:4–17.[8]

Claim 1 from the '921 Patent and Claim 7 from the '079 Patent, exemplary claims from the respective patents, describe the claimed dynamic address change system. The claims are reproduced below with the disputed terms in bold:

**'921 Patent**

**1.** Component circuitry, comprising:

an interface for coupling to a master; and

a **dynamic address generator** coupled to the interface, the **dynamic address generator selectively generating component addresses**, wherein substantially immediately following an event, the component circuitry performs in succession a plurality of sets of operations, each set of operations comprising receiving, by the interface, an address change request from the master and generating a new component address by the **dynamic address generator** in response, a last one of

[8] The written descriptions for the '921 and '079 Patents are identical, so for convenience all citations for the Second Family of Address Change Patents will be to the '921 Patent.

the new component addresses generated being available as the component address for the component circuitry in one or more subsequent communications with the master, the event comprising at least one of the component circuitry being coupled to the master, the component circuitry initially receiving power and the component circuitry being reset.

**’079 Patent**

**7.** Component circuitry, comprising:

an interface for coupling to a master over a shared bus; and

a **dynamic address generator** coupled to the interface for generating a component address, wherein substantially immediately following a predetermined event and in a continual series of a plurality of address change requests received by the interface and corresponding acknowledgements sent thereby in reply, for each address change request received the **dynamic address generator generates a new component address**, wherein the component circuitry uses a last one of the new component addresses generated as the component address for one or more subsequent communications with the master.

| **Construction of “Dynamic Address Generator”** | | | |
|---|---|---|---|
| **Disputed Claim Term[9]** | **Lexmark’s Construction[10]** | **UII’s Construction** | **Court’s Construction** |
| “dynamic address generator” | “software or electronic circuitry capable of implementing an algorithm that generates a new | “software or electronic circuitry capable of implementing an algorithm to create values by performing the specified algorithm, resulting in | “software or electronic circuitry capable of implementing an algorithm that generates |

[9] “Dynamic address generator” appears in Claims 7, 12, and 17 of the’079 Patent and Claims 1, 9, and 15 of the’921 Patent. “Dynamic address generator generates a new component address” appears in Claims 7 and 12 of the’079 Patent and Claim 15 of the ’921 Patent. “Dynamic address generator selectively generating component addresses” appears only in Claims 1 and 15 of the ’921 Patent.

[10] At the hearing, Lexmark stipulated to the first portion of UII’s proposed construction up to “create.” Dkt. 116 (Hr’g Tr.) at 48.

| | | | |
|---|---|---|---|
| | component address” | a significant number of highly irregular and unpredictable series of values” | a new component address” |
| “dynamic address generator generates a new component address” | “software or electronic circuitry capable of implementing an algorithm that generates a new component address” | “software or electronic circuitry capable of implementing an algorithm to create values by performing the specified algorithm, resulting in a significant number of highly irregular and unpredictable series of values, which value a component uses” | “software or electronic circuitry capable of implementing an algorithm that generates a new component address” |
| “dynamic address generator selectively generating component addresses” | “software or electronic circuitry capable of implementing an algorithm that selectively generates new component addresses” | “software or electronic circuitry capable of implementing an algorithm to create values by performing the specified algorithm, resulting in a significant number of highly irregular and unpredictable series of values in response to a command issued by the master” | “software or electronic circuitry capable of implementing an algorithm that selectively generates new component addresses” |

**<u>Dispute</u>:** The term “dynamic address generator” is not a term of art in the field of microchip technology. It is a term coined by the patentee and must be construed. Lexmark has agreed to accept the initial portion of UII’s proposed construction up to the word “create,” but argues the rest of UII’s construction is unwarranted. As with the First Family of patents, Lexmark contends that including

"create" is not supported by the intrinsic evidence. And the phrase "may be capable of generating a significant number of addresses, but in a highly irregular and unpredictable manner" comes from an embodiment of the invention and thus should not be read into the claim. Lexmark's position is that the "dynamic address generator" should just be construed as "software or electronic circuitry capable of implementing an algorithm that *generates a new component address*."

**Analysis:** The Court accepts Lexmark's construction. For the reasons stated in the discussion of the First Family of Address Change Patents, there is no basis for using "create" to define the dynamic address generator. And as Lexmark points out, the rest of language in UII's proposed construction derives from permissive language in one of the embodiments of the invention—thus committing one of the "cardinal sins" of patent law. *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001).

In describing one embodiment of the invention using a dynamic address generator, the specification states: "Each dynamic address generator [ ] may include a pseudorandom address generator that generates addresses according to a predefined algorithm. The pseudorandom address generator may be capable of generating a significant number of addresses, but in a highly irregular and unpredictable manner." '921 Patent, 5:50–55. So not only does this describe one of the embodiments of the invention, but the use of "may" further signifies this

feature is permissive and not required of all modes of the invention. *See, e.g.*, *Vehicle IP, LLC v. AT&T Mobility, LLC*, 594 F. App'x 636, 643 (Fed. Cir. 2014) (noting that "may" is a permissive term); Antonin Scalia & Bryan A. Garner, *Reading Law* 112–15 (2012) (same). Further still, the portion of the patent this language appears in, "The Detailed Description of The Drawings," includes disclaimers at the beginning and end of the section stating that the description of the embodiments should not be understood as limiting the scope of the claims. '921 Patent, 3:36–41, 9:28-34. The Court therefore declines to read this limitation into the claim language and construes the term "dynamic address generator" simply to mean "software or electronic circuitry capable of implementing an algorithm that generates a new component address."

### C. Lexmark's U.S. Patent Nos. 7,844,786 and 8,966,193 ("Punch Out Bit Field Patents")

The '786 Patent and '193 Patent are entitled "Addressing and Command Protocols for Non-Volatile Memories Utilized in Recording Usage Counts," and "Addressing, Command Protocol, and Electrical Interface for Non-Volatile Memories Utilized in Recording Usage Counts Sensor," respectively. These patents relate generally to non-volatile memory and, more specifically, to a method for measuring and recording the usage of consumable components with a limited

lifespan—like the amount of toner or paper used in a printer or imaging device. ’193 Patent, 1:20–28, 4:61–65.

The Punch Out Bit Field Patents describe and claim the protocols for sending the commands for the count increments and toner levels to the memory modules. Once pages are printed or toner is used, the printer or imaging device sends a command to one or more memory modules to “punch out” a specified bit to record the paper or toner usage. *Id.*, 5:9–12, 12:15–46.

Claim 1, an exemplary claim from the ’786 Patent, claims the “punch out” method. The disputed claim terms are in bold:

> **1.** A method of updating memory modules, comprising:
>
> receiving, at one or more memory modules, a command transmitted from a processing device, wherein the command comprises a) an increment counter command operable to instruct the one or more memory modules to increment a counter within the one or more memory modules and b) a **punch out bit field command** operable to instruct the one or more memory modules to **punch out a specified bit field** within the one or more memory modules; and
>
> processing the command at the one or more memory modules.

Claim 1 of the ’193 Patent claims the method specifically as it pertains to toner or ink usage:

> **1.** A method of updating a memory module, comprising:
>
> receiving, at a memory module, a command indicative of usage of toner or ink in a consumable item for an imaging device for instructing the memory module to **punch out at least one bit** of at least one specified bit field within the memory module indicative of the usage of toner or ink; and

processing the command at the memory module.

| Construction of "Punch Out" | | | |
|---|---|---|---|
| **Disputed Claim Term**[11] | **Lexmark's Construction**[12] | **UII's Construction** | **Court's Construction** |
| "punch out bit field command" | "command to change at least one bit, in a specific bit field in the one or more non-volatile memory modules" | "a command which identifies at least one of the non-volatile memory modules and a location of a bit field in at least one of the memories to be changed from an erased state to a programmed state" | "command to change at least one bit, in a specific bit field in the one or more non-volatile memory modules" |
| "punch out a specified bit field" | "changing a specified bit or specified group of bits in one or more non-volatile memory modules" | "changing a specified bit or specified group of bits in a non-volatile memory, from an erased state to a programmed state" | "changing a specified bit or specified group of bits in a non-volatile memory module" |
| "punch out at least one bit" | "change at least one bit, in the non-volatile memory module" | "changing at least one bit in non-volatile memory from an erased state to a programed state" | "change at least one bit, in the non-volatile memory module" |

**<u>Dispute</u>:** The term "punch out" is not a term of art in microchip technology. It is a term coined by the patentee. The parties agree that "punching out" a bit

[11] "Punch out bit field command" appears in principle in Claims 1 and 9 of the '786 Patent. "Punch out a specified bit field" appears in principle in Claims 1, 9, and 16 of the '786 Patent. "Punch out at least one bit" appears in principle in Claims 1, 10, 17, and 30 of the '193 Patent.

[12] Lexmark agreed at the hearing that the patents apply to non-volatile memory but are not limited only to flash memory as UII's proposed definition suggests. Dkt. 116 at 104.

means to change a bit or field in the non-volatile memory module. They disagree over whether "punching out" requires changing a bit "from an erased state to a programmed state." Lexmark argues it would be improper to include this limitation because it would unduly limit the patents to flash memory—a specific type of non-volatile memory.

**Analysis:** The Court agrees with Lexmark that UII's proposed limitation is unwarranted for two reasons. First, the "from an erased to a programmed state" language serves only "as an example" of how a bit may be "punched out." '193 Patent, 5:15–20; '786 Patent, 5:2–7, 12:39–48. This exemplary language implicates the written description's teaching function and does not evince a desire to limit the scope of the claimed invention. Second, the doctrine of claim differentiation cuts against UII's proposed definition. In the '786 Patent, Claims 1 and 9 require a "punch out bit field command." Claims 7 and 10, dependent claims of Claims 1 and 9, add the requirement that "wherein the punch out bit field command comprises implementing a command to change a bit associated with at least one memory module from an erased state to a programmed state." So reading UII's proposed language into Claims 1 and 9 would render the dependent claims superfluous and violate a core tenant of claim construction. *See Springfield Co., Inc. v. Staubli Corp.*, 152 F.3d 948 (Fed. Cir. 1998) ("The doctrine of claim differentiation embodies the notion that language in one claim should not be

interpreted so as to make another claim, often a dependent claim, superfluous.”). Therefore, the Court adopts Lexmark’s proposed construction.

**D. UII’s U.S. Patent No. 7,005,733 (“Anti-Tamper Patent”)**

The ’733 Patent is entitled “Anti Tamper Encapsulation for an Integrated Circuit.” The patent generally relates to use of encryption methods to protect information stored in a microchip or memory circuit. The patent claims two primary concepts for the invention. The first is an integrated circuit device that uses a “protective member,” which is an encapsulation layer that prevents physical access to the memory circuit. The encryption used by the integrated circuit assembly responds to the physical parameters of the “protective member” so that tampering with the “protective member” to gain access to the memory circuit will corrupt the encryption process, making the data within the memory circuit inaccessible. *See* ’733 Patent, 2:21–49. The patent describes nine embodiments for practicing this mode of the invention. *See id.*, 5:31–12:33, 13:56–14:61, 19:25–67.

The second apparatus uses a key register and alternation circuit that holds the encryption data in fluctuating form. The key register stores the encryption key in an alternation circuit that “var[ies] the data in the key register at frequent intervals.” This method is designed to prevent attacks by freezing the key register using radiation or cooling. *Id.*, 12:34–37. This method is exemplified in the Sixth Embodiment of the invention. *Id.*, 12:34–13:13.

Claim 1 provides an exemplary claim for the integrated circuit device using the "protective member." The terms the parties dispute are in bold:

> **1.** An integrated circuit device comprising:
>
> a protective member which reduces access to the device;
>
> one or more sensors for sensing one or more physical parameters from the **protective member**; and
>
> a **circuit which encrypts and decrypts protected data**, wherein **the circuit is adapted to derive encryption values from the one or more physical parameters sensed**, **the encryption values being essential to the process of encrypting and decrypting the protected data, such that tampering with the protective member to gain access to the circuit corrupts the encryption values.**

Claim 36 claims the method using the alternation circuit. The claim is reproduced below with the disputed language in bold:

> **36.** An integrated circuit device comprising a memory in which data is stored in encrypted form, and a circuit for encrypting and/or decrypting to write and/or read the data, the circuit comprising a key register storing a key for use in said encryption and/or decryption process, and **an alternation circuit arranged to vary the data stored in the key register at frequent intervals.**

***1. "protective member"***

| **Disputed Claim Term** | **Lexmark's Construction** | **UII's Construction** | **Court's Construction** |
|---|---|---|---|
| "Protective member" | 35 U.S.C. § 112(f) applies.<br><br><u>Function:</u> Protecting the integrated circuit device<br><br><u>Corresponding structure</u>: | 35 U.S.C. § 112(f) does not apply.<br><br>If 35 U.S.C. § 112(f) does apply, then: | 35 U.S.C. § 112(f) applies.<br><br><u>Function:</u> protecting the integrated circuit device<br><br><u>Corresponding Structure:</u> An |

| | | | |
|---|---|---|---|
| | A non-mesh encapsulation or packaging layer that cryptographically protects the integrated circuit in both a powered and non-powered state. The encapsulation material is epoxy resin-based and either:<br><br>(1) contains discontinuities or inhomogeneities that are distributed randomly or chaotically ("First Embodiment");<br><br>(2) contains a plurality of particles of various sizes, shapes and/or magnetic permeabilities that surrounds the integrated circuit device on both sides ("Second Embodiment");<br><br>(3) contains a conductive powder intermixed therein having a relatively high electrical resistance such as graphite, Gallium, Copper Oxide, or Selenium, and additionally includes conductive particles such as strands of | <u>Function:</u> Protecting the integrated circuit<br><br><u>Corresponding Structure:</u> Encapsulation or packaging around a circuit<br><br>If 35 U.S.C. § 112(f) does not apply, then plain and ordinary meaning, no construction needed. If construction is needed, then "a layer over and/or around the circuit which reduces access to the circuit" | encapsulation or packaging layer that protects the integrated circuit. The encapsulation material is epoxy-resin based and at least one of the following:<br><br>(1) contains discontinuities or inhomogeneities that are distributed randomly or chaotically;<br><br>(2) contains a plurality of particles of various sizes, shapes and/or magnetic permeabilities that surrounds the integrated circuit device on both sides;<br><br>(3) contains a conductive powder intermixed therein having a relatively high electrical resistance such as graphite, Gallium, Copper Oxide, or Selenium, and additionally includes conductive particles such as strands of copper wire of varying lengths, widths, shapes and/or conductivities |

| | | | |
|---|---|---|---|
| | copper wire of varying lengths, widths, shapes and/or conductivities intermixed non homogenously ("Third Embodiment");<br><br>(4) contains a plurality of particles that change the dielectric constants of the encapsulation locally ("Fifth Embodiment");<br><br>(5) contains a plurality of randomly distributed property modifying particles and a plurality of microcapsules containing one or more encapsulated surfaces (i.e., in liquid form) ("Eight Embodiment");<br><br>(6) is made of a light transmissive matrix such as a polymer (e.g., epoxy polyacryl), alkali silicate (such as NaSi4), or comprises a crystalline light transmissive solid (e.g., a crystallized polymer), and includes a plurality of randomly dispersed small crystal grain particles which interact with light or a plurality | | intermixed non homogenously;<br><br>(4) contains a plurality of particles that change the dielectric constants of the encapsulation locally;<br><br>(5) contains a plurality of randomly distributed property modifying particles and a plurality of microcapsules containing one or more encapsulated surfaces (i.e., in liquid form);<br><br>(6) is made of a light transmissive matrix such as a polymer (e.g., epoxy polyacryl), alkali silicate (such as NaSi4), or comprises a crystalline light transmissive solid (e.g., a crystallized polymer), and includes a plurality of randomly dispersed small crystal grain particles which interact with light or a plurality of decrystallized areas;<br><br>(7) is mixed with a small amount of particles which transmit beta rays (e.g., particles of radioactive |

| | | | |
|---|---|---|---|
| | of decrystallized areas ("Ninth Embodiment")<br><br>(7) is mixed with a small amount of particles which transmit beta rays (e.g., particles of radioactive isotopes such as uranium) (Embodiment of "Other Sensors and Parameters");<br><br>(8) contains varying particles of ferroelectric materials, as used in ferroelectric RAM technology (Embodiment of "Other Sensors and Parameters"); or<br><br>(9) contains varying particles of magnetized ferromagnetic materials (Embodiment of "Other Sensors and Parameters").<br><br>If 35 U.S.C. § 112(f) does not apply, then "protective member" means "a non-mesh encapsulation or packaging layer that cryptographically protects the integrated circuit in both a | | isotopes such as uranium);<br><br>(8) contains varying particles of ferroelectric materials, as used in ferroelectric RAM technology; or<br><br>(9) contains varying particles of magnetized ferromagnetic materials. |

| | | | |
|---|---|---|---|
| | powered and nonpowered state.” | | |

**<u>Dispute</u>:** The dispute here is whether “protective member” should be construed as a means-plus-function claim under § 112(f).

**<u>Analysis</u>:** To begin, the claim does not use the term “means,” so the presumption is that §112(f) does not apply. The presumption, however, is overcome here because the term “protective member” does not connote a definite structure. *See Williamson*, 792 F.3d at 1349. “Member” is a nonce word—a verbal construct that does not connote structure—that various courts have found serves as a stand-in for “means.” *See Toshiba Tec Corp. v. Katun Corp.*, No. SA CV 15-1979, 2016 WL 8861713, at *15 (C.D. Cal. Dec. 1, 2016); *see also Mas-Hamilton Grp. v. LaGard, Inc.*, 156 F.3d 1206, 1215 (Fed. Cir. 1998) (finding that “movable link member” was properly construed as a means-plus-function limitation).[13] And “protective” does not alter the meaning of member to give the term a structural meaning. Rather, it further describes the member’s function—protecting the circuit.

[13] *K2M, Inc. v. OrthoPediatrics Corp.*, No. 17-61-GMS, 2018 WL 2426660, at *1 n.2 (D. Del. May 30, 2018) (construing “grasping member” as a means-plus-function limitation); *Not Dead Yet Mfg., Inc. v. Pride Sols., LLC*, No. 13 C 3418, 2015 WL 5829761, at *12 (N.D. Ill. Oct. 5, 2015) (construing “retention member” as a means-plus-function limitation).

Without a sufficient structure, the next step is to identify the function the "protective member" serves. *Micro Chem.*, 194 F.3d at 1258. Here, the parties generally agree that the function of the "protective member" is to protect the integrated circuit device.

After identifying the function, the court looks to the written description to find the structure corresponding to the function. *Id.* A means-plus-function claim incorporates all the structures recognized in the specification that correspond to the identified function and all equivalent structures. 35 U.S.C. § 112(f). This may include multiple embodiments of the invention. *Micro Chem.*, 194 F.3d at 1258. And "[w]hen multiple embodiments in the specification correspond to the claimed function, proper application of § 112(f) generally reads the claim element to embrace each of those embodiments." *Id.*

The specification identifies the basic structure of the "protective member" as an "encapsulation or packaging" layer that reduces access to the memory circuit. *See* '733 Patent, 2:23–24. The specification identifies nine embodiments for practicing the claimed invention. Each one includes an encapsulation layer that is epoxy-resin based. *See* '733 Patent, 9:66–67; 10:47–49; 10:54–55; 11:24–25; 12:17–18; 18:50–52. The "protective members" in each of the nine embodiments also include the additional properties recounted in the chart above. So giving the functional claim its full scope, the appropriate structure for the "protective

member" is an encapsulation or packaging layer that is epoxy-resin based and includes one of the other structural limitations provided for in the embodiments of the invention listed in the chart above.

The Court, however, declines to read in the other limitations Lexmark advocates: that the structure (1) be non-mesh and (2) must cryptographically protect the integrated circuit in both a powered and non-powered state. The non-mesh requirement stems from what Lexmark purports was the patentee's disavowal of mesh structures through the criticism of the prior art. Yet this criticism was limited to the patentee's single, passing reference in the "Background of the Invention" to the inadequacy of mesh protective layers used in prior microchips. '733 Patent, 1:51–57. This did not amount to a disavowal. *See Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1336 (Fed. Cir. 2009) (finding a "single, passing reference to" a feature of prior art "as a relatively unsatisfactory" feature "does not disavow the use of " that feature). The "powered and non-powered" limitation goes to the function of the "protective member," not its structural qualities, so it would seem unnecessary to add this as a structural requirement. The Court therefore rejects both these limitations and adopts the construction and corresponding structures previously identified.

### *2. "circuit which encrypts and decrypts data"*

| Disputed Claim Term | Lexmark's Construction | UII's Construction | Court's Construction |
|---|---|---|---|
| "circuit which encrypts and decrypts data" | "circuit which both encrypts and decrypts data" | Plain and ordinary meaning, no construction needed. If construction is needed, then "integrated circuit assembly such as an electrical integrated circuit or computer chip which encrypts and decrypts protected data" | Plain and ordinary meaning |

**Dispute:** Whether the disputed phrase should include the word "both" to signify that the circuit both encrypts and decrypts data.

**Analysis:** The Court finds that adding "both" is unnecessary. The common meaning of "and" is conjunctive, not disjunctive. *See, e.g.*, *SuperGuide Corp. v. DirecTV Enter., Inc.*, 358 F.3d 870, 886 (Fed. Cir. 2004). A construction in which two elements are joined by "and" entails an implied *both* before the first element. *See* Antonin Scalia & Bryan A. Garner, *Reading Law* 117–18 (2012). A jury would therefore understand the plain claim language to mean the circuit must *both* encrypt and decrypt data.

### *3. "the circuit is adapted to derive . . ."*

| Disputed Claim Term | Lexmark's Construction | UII's Construction | Court's Construction |
|---|---|---|---|
| "the circuit is adapted to derive encryption | "the circuit derives a cryptographic input by sensing one or more | Plain and ordinary meaning, no construction needed. If | Plain and ordinary meaning |

| | | | |
|---|---|---|---|
| values from one or more physical parameters sensed” | bulk or surface parameters or non-homogenous discontinuities in the encapsulation or packaging layer, and uses the cryptographic input as an input to the encryption /decryption algorithm” | construction is needed, then “the circuit derives encryption values by sensing one or more physical properties of the protective member” | |
| “the encryption values being essential to the process of encrypting and decrypting the protected data, such that tampering with the protective member to gain access to the circuit corrupts the encryption values” | “the cryptographic input is used as an input to the encryption/decryption algorithm to encrypt/decrypt the protected data, such that tampering with the encapsulation or packaging layer destroys the cryptographic input” | Plain and ordinary meaning, no construction needed. If construction is needed, then “the encryption values are necessary to the process of encrypting and decrypting the protected data, such that tampering with the protective member corrupts the encryption values” | Plain and ordinary meaning |

**Dispute:** For the final portion of Claim 1, Lexmark proposes replacing “encryption values” with “cryptographic input” and including terms to qualify the “physical parameters” that play a role in the encryption process. In response, UII advocates keeping the plain claim language intact. The Court agrees that the plain language will suffice.

**Analysis:** Read in its entirety, the disputed language is relatively straightforward and comprehensible to a jury. The encryption values are the data

gathered from the physical sensors within the "protective member." The data gathered from the sensors are used in the encryption process to protect the memory circuit shielded by the "protective member." Once the "protective member" is tampered with, the information held in the memory circuit cannot be accessed.

There are two circumstances that warrant departure from the plain and ordinary meaning of the claim language: lexicography and disavowal. *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014). Neither applies here. First, nothing in the specification suggests that the patentee intended to provide a unique definition for any of the disputed terms. There is no indication that "cryptographic input" was intended to stand in for "encryption value." There is also no indication that the patentee intended to limit "physical parameters" to "bulk or surface parameters or non-homogenous discontinuities" in the encapsulation layer. The specification identified the quoted language as an example structure for the physical parameter, not its exclusive structure. '733 Patent, 2:58–60. There was also no express disavowal or limitation of the plain meaning of the claim language within the specification or during prosecution.

Moreover, Lexmark's construction would not assist the jury. It would do just the opposite. The proposed construction is more cumbersome and denser than the original claim language and would be harder for a jury to comprehend than the claim as it is now written. *AFG Indus., Inc. v. Cardinal IG Co.*, 239 F.3d 1239,

1247 (Fed. Cir. 2001) ("It is critical for trial courts to set forth an express construction of the material claim terms in dispute, in part because the claim construction becomes the basis of the jury instructions, should the case go to trial." (citation omitted)). Because of this and the lack of evidence that the patentee sought to define or limit the claim language, the disputed language will retain its plain meaning.

### 4. *"an alternation circuit arranged to vary the data stored in the key register at frequent intervals"*

| Disputed Claim Term | Lexmark's Construction | UII's Construction | Court's Construction |
|---|---|---|---|
| "an alternation circuit arranged to vary the data stored in the key register at frequent intervals" | "an alternation circuit toggles each bit of the encryption key stored in the key register of flip flops every (random) CPU clock cycle to obscure the actual encryption key" | Plain and ordinary meaning, no construction needed. If construction is needed, then "a circuit adapted to alter the data stored in the key register at frequent intervals" | Plain and ordinary meaning |

**<u>Dispute</u>:** Lexmark advocates adopting its proposed construction for "alternation circuit," which it argues is clearly set out in the patent specification and supported by statements the patentee made during prosecution. UII again counters that the plain meaning should prevail.

**<u>Analysis</u>:** Lexmark has failed to provide a basis for departing from the claim language. There is no clear indication in the specification that the patentee intended

to limit the claim to the terms of Lexmark's proposed definition. Lexmark's definition draws directly from the Sixth Embodiment of the invention. *See* '733 Patent, 12:59–65, 13:10–13. Though this is the only embodiment of the invention that demonstrates the alternation circuit, nothing indicates that the embodiment was meant to limit the scope of Claim 36. So it would be improper to read limitations from the embodiment into the claim. *See Liebel–Flarsheim*, 358 F.3d at 906.

Lexmark's contention that the patentee limited the claim to Lexmark's proposed construction during prosecution is also incorrect. The statement Lexmark cites as evidence of this was made in response to the rejection of what is now Claim 36 for failing to satisfy § 112(a)'s written description requirement. In the statement cited by Lexmark, the patentee clarified that he had described the claim in sufficient detail to enable one skilled in the art to make or use the invention.[14] "[C]learly describing a particular claim term to overcome a[ ] . . . written

---

[14] The full text of the patentee's response to the patent examiner following the rejection of what would become Claim 36:

> Furthermore, Applicants fully describe the key register storing a key where each bit of the key is toggled every (random) clock cycle, whilst maintaining the key on the output ports of the bank of second multiplexers for use in encryption/decryption. Specification, p. 28, line 1 – p. 29, line 15. This claim limitation has been described in the specification in sufficiently full, clear, concise and exact terms to enable any person [s]killed in the art to make or use the invention. [The] Claim [ ] is thus allowable for this reason.

Dkt. 105, J.A. at 247.

description rejection is not the same as clearly disavowing claim scope." *Cont'l Cirs. LLC v. Intel Corp.*, 915 F.3d 788, 798–99 (Fed. Cir. 2019). The patentee's statements in this instance explained that he had provided a sufficient written description and nothing more.

Finally, Lexmark argues that the Court must adopt its construction, or the claim will fail for indefiniteness because the term "frequent intervals" lacks objective boundaries to allow one skilled in the art to perform the invention. *See* § 112(b); *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). The specification does not provide a standard for determining the frequency of the intervals for varying the data stored in the key register. But reading a limitation from an embodiment into the claim without the patentee expressing the intent to do so is not warranted. *See Liebel–Flarsheim*, 358 F.3d at 906. When the intrinsic evidence does not provide a standard for measuring a term of degree, the Federal Circuit has often ruled it would be error to impose a more exact construction on the term. *See, e.g.*, *PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998); *Renishaw PLC*, 158 F.3d at 1249.

**V. CONCLUSION**

The Court adopts the claim constructions as set forth above.

**DONE AND ORDERED** at Tampa, Florida on May 14, 2021.

*/s/ William F. Jung*

**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO**:
Counsel of Record